**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| My Health, Inc., § § § *Plaintiff*, § v. § Case No. 2:16-cv-00535-RWS-RSP (Lead) § ALR Technologies, Inc., § § *Defendant*. § | | |
| InTouch Technologies, Inc., § § § Case No. 2:16-cv-00536-RWS-RSP *Defendant*. § | | |
| MyNetDiary, Inc., § § § Case No. 2:16-cv-00866-RWS-RSP *Defendant*. § | | |
| McKesson Technologies Inc., § § § Case No. 2:16-cv-00881-RWS-RSP *Defendant*. § | | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

In May 2016, My Health filed a number of patent infringement lawsuits in the district, and about ten months later, the Court declared the patent-in-suit (U.S. Patent No. 6,612,985) invalid for failure to claim patent-eligible subject matter as required by 35 U.S.C. § 101. Defendants' motions to dismiss were granted, and final judgment was entered. This outcome, in addition to My Health's extensive litigation campaign, the manner in which My Health litigated the cases, and the weakness of My Health's § 101 position, prompted the prevailing defendants to move for their attorneys' fees under 35 U.S.C. § 285. Dkt. No. 81. For the following reasons, the Court finds

My Health's cases exceptional, grants defendants' motion for fees, and orders My Health to pay $371,862.95 to the defendants.

## BACKGROUND

My Health's assertion of the '985 patent began in April 2012, with a lawsuit filed against ZeOmega Inc.[1] Although the lawsuit against ZeOmega remained pending for nine months, there was never a determination on the merits, and the parties settled in January 2013. *See id.*, Dkt. No. 59. My Health then sued five additional defendants in February 2013.[2] Aside from venue-related motions filed in three of these cases, there was no significant activity in the case, and no merits determination. One of the five defendants, Cadiocom, petitioned the Patent Trial and Appeal Board (PTAB) for inter partes review (IPR) of the '985 patent, and the PTAB instituted IPR, but My Health settled with Cardiocom before trial.[3]

My Health's litigation campaign continued through 2017. In total, My Health filed 31 lawsuits in the district. In addition to these lawsuits, parties that were either sued or threatened with suit filed eleven declaratory judgment actions in other districts. Of all these lawsuits, there was never a determination regarding the merits until 2017. In My Health's lawsuit against LifeScan in 2015, the Court denied a motion to dismiss because of an apparent need for claim construction in advance of determining whether the claims of the '985 patent are directed to patent-eligible subject-matter.[4] There was, however, no determination regarding whether the '985 patent claims were eligible under § 101.

---

[1] Case No. 2:12-cv-00251 (E.D. Tex.).
[2] Case Nos. 2:13-cv-00136, 2:13-cv-00137, 2:13-cv-00138, 2:13-cv-00139, and 2:13-cv-00140 (all E.D. Tex).
[3] IPR2013-00320.
[4] *My Health, Inc. v. LifeScan, Inc.*, Case No. 2:14-cv-00683-RWS-RSP, Dkt. No. 34 (E.D. Tex.)

Aside from the district court actions, there were five petitions for IPR, all of which settled before trial. The PTAB granted IPR on all the petitions that made it to the point of an institution decision, but a trial was never held. Other IPR petitions were dismissed before an institution decision was made.

The district court cases and the IPR proceedings all ended with settlement. Some of My Health's settlement agreements, which were produced for *in camera* review, *see* Dkt. No. 118, reveal a median settlement amount of about $50,000. The earlier agreements were for significantly higher amounts than the later ones. In the lawsuits filed before 2014—before the Supreme Court's decision in *Alice Corporation Pty. v. CLS Bank International*, 134 S. Ct. 2347 (2014), was fully understood—the median settlement amount was $240,000. That median value dropped to $42,500 in cases filed in 2014 and after. Of the seventeen settlement agreements reached after 2014, ten of them fell between $25,000 and $50,000, and most of them were around $30,000. Three of the agreements—involving different defendants—were all for exactly $30,000.

There is not much of a behind-the-scenes view between 2012 and 2014, but there is evidence in the record regarding My Health's litigation behavior in the cases filed in 2016. The dispute with ALR Technologies ("ALRT"), for example, began with a cease and desist letter from Patent Licensing Alliance ("PLA"), My Health's licensing affiliate, asking ALRT to stop infringing the '985 patent. Dkt. No. 81-7. ALRT responded with a letter from counsel explaining its belief that the '985 patent was invalid under *Alice*. Dkt. No. 81-8. My Health did not respond but eventually sued ALRT. Despite My Health's knowledge that ALRT was represented by counsel, My Health's counsel sent a letter directly to ALRT's CEO after filing the lawsuit. The letter explained, among other things, that My Health will "remain open and willing to explore an early resolution that would conclude the legal proceedings." Dkt. No. 81-18.

InTouch Technologies received a similar letter after My Health sued them. Dkt. No. 81-20. Counsel for InTouch responded with a letter explaining, among other things, that My Health was improperly reading the '985 patent to cover "physician consultations and decisions" made by a doctor, which according to InTouch, "reinforces the unsupportable and unpatentable claim breadth My Health is advancing." Dkt. No. 81-9. My Health did not respond. My Health did, however, continue to make settlement demands.

Like ALRT, MyNetDiary also received a cease and desist letter from PLA before being sued. Dkt. No. 81-19. MyNetDiary's counsel responded with a detailed letter explaining how "virtually all of the applications" mentioned in the cease and desist letter "are not covered or used by MyNetDiary's technology or its customers." Dkt. No. 81-12 at 3. The letter also asked My Health to "please make certain that any and all future correspondence, if any, with MyNetDiary is directed solely to us as the attorneys for MyNetDiary." *Id.* at 5. Despite this request, PLA again sent a letter directly to MyNetDiary's CEO expressing My Health's desire for an "amicable licensing arrangement." Dkt. No. 81-14 at 1.

The letter to MyNetDiary was not taken lightly. MyNetDiary's counsel responded to My Health's counsel with an email in January 2016. Dkt. No. 81-15. The email emphasized MyNetDiary's request to not be contacted directly by My Health's counsel:

> Please direct any future correspondence regarding this matter to me and to me alone. I wish there to be no misunderstandings. My client will not be entering into any licensing agreements with PLA, for the reasons I have previously explained. I wish this to be very clear. Should you contact me or my client(s) with any further unlawful extortion requests, I will seek sanctions against you . . . . I hope I have made myself imminently clear.

*Id.* The request was ignored. After My Health sued MyNetDiary, My Health's counsel sent another letter directly to MyNetDiary's CEO, which emphasized My Health's commitment to "an early resolution that would conclude legal proceedings." Dkt. No. 81-16.

4

McKesson was sued in August 2016. Before McKesson's answer to the complaint was due, McKesson informed My Health's counsel of McKesson's belief that the allegations were unsupportable and based on "unpatentable claim breadth." Dkt. No. 81-10 at 1. McKesson also informed My Health that the infringement allegations were based on "the Health Buddy appliance," which McKesson purchased from Bosch. *See* Dkt. No. 81-11 at 1. Because My Health had previously filed and settled a lawsuit against Bosch, McKesson informed My Health that the Health Buddy appliance was covered by the license My Health granted to Bosch. *See id.* My Health never responded to McKesson's inquiry regarding the Bosch license.

Despite My Health's avoidance of any merits determination between 2012 and 2014, the defendants remaining in the lawsuits filed in 2016 finally received such a determination. These defendants moved to dismiss My Health's complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, contending that the claims of the '985 patent do not recite patent-eligible subject matter. The Court agreed. *See* Case No. 2:16-cv-00535-RWS-RSP, Dkt. No. 66 (E.D. Tex. Feb. 14, 2017). Suffice it to say that the Court concluded that the claims of the '985 patent are "unquestionably 'abstract' within the meaning of *Alice*." *See id.* at 3. The claims did not require any hardware or software component and were broadly directed to "[a] method of tracking [a patient's] compliance with treatment guidelines." *See id.* The Court explained its previous decision to postpone the § 101 determination in the *LifeScan* case, noting that LifeScan's § 101 arguments were more dependent on particular claim terms, whereas the latter defendants more clearly advanced arguments based on any plausible claim construction, in addition to analogizing the '985 patent claims to others found unpatentable by the Federal Circuit. *See id.* at 6.

After defendants' motions to dismiss were granted, final judgment was entered. The defendants then filed a motion to declare My Health's cases exceptional under § 285 and requested

their attorneys' fees. Dkt. No. 81. My Health appealed from the final judgment based on the § 101 decision, Dkt. No. 85, and requested that the motion for attorneys' fees be stayed pending appeal, Dkt. No. 89. That motion was denied. Dkt. No. 98.

On June 30, 2017, the day My Health's appeal brief was due, My Health moved to voluntarily dismiss the appeal. *See* Dkt. No. 106-1. My Health's counsel made the following statement in the motion filed with the Federal Circuit:

> My Health request[s] that the Court grant the voluntary dismissal of this appeal, with each side to bear its own costs. Undersigned counsel has conferred with counsel for appellees and has been informed that this motion is unopposed.

*Id.* at 1-2. The motion to dismiss was granted on the basis of this representation, and the order declared that "[e]ach side shall bear its own costs." *See* Dkt. No. 105 at 2. After the Federal Circuit entered this order, the defendants filed a notice representing that My Health's counsel never conferred with them regarding the voluntary dismissal, and that they never agreed that each party should bear its own costs for the appeal. *See* Dkt. No. 106 at 1.

While My Health's appeal was pending, the Court had scheduled a hearing on defendants' motion for attorneys' fees on June 19, 2017. On June 13, My Health's counsel filed a motion to continue the hearing, citing a conflict due to another case that was scheduled for a July trial in California. *See* Dkt. No. 100. The day after My Health's counsel sought a continuance, but before the Court had ruled on the motion, My Health's counsel asked the California court to continue the July trial to September, and that request was granted. *See* Dkt. No. 106 at 1-2. Without knowing about the schedule change in California, the Court granted My Health's motion to continue and rescheduled the attorneys' fees hearing for August 15, 2017.

During the hearing on the attorneys' fees motion, My Health's counsel focused largely on arguments that were never raised in My Health's briefing, including the sufficiency of My Health's

6

infringement contentions. My Health's counsel also argued that My Health's settlement agreements reflected more than nuisance amounts. *See* Tr. at 18:22-19:11, Dkt. No. 129 ("[T]he settlements that have been entered into in the past have been in the range of [$]400,000 for two, [$]285,000 for one, [$]175,000 for another."). Counsel emphasized some of the largest settlement agreements, which the Court later found out—after ordering My Health to produce relevant agreements for *in camera* review—were entered into well before the *Alice* decision. The trend in settlement agreements made thereafter was never brought to the Court's attention. Defendants explained their view that the cases should be declared exceptional regardless of the amount of any settlement agreement or the adequacy of My Health's infringement contentions.

## DISCUSSION

Section 285 of the Patent Act allows a district court, in an exceptional case, to award reasonable attorney fees to the prevailing party. 35 U.S.C. § 285. "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). An exceptional case under § 285 is "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id.*

My Health's cases are exceptional for a number of reasons. The first is the weakness of My Health's post-*Alice* patent-eligibility position. Patient treatment and monitoring methods such as those claimed by the '985 patent had been declared ineligible long before My Health filed its 2016 lawsuits. *See, e.g.*, *SmartGene, Inc. v. Advanced Biological Labs., SA*, 555 Fed. App'x 950 (Fed. Cir. 2014). Although *SmartGene* was an unpublished opinion, it was representative of

7

numerous precedential opinions recognizing that "merely selecting information, by content or source, for collection, analysis, and [announcement] does nothing significant to differentiate a process from ordinary mental processes, whose implicit exclusion from § 101 undergirds the information-based category of abstract ideas." *FairWarning IP, LLC v. Iatric Systems, Inc.*, 839 F.3d 1089, 1098 (Fed. Cir. 2016) (citation omitted).

As the Court recognized in evaluating defendants' § 101 motion, "[s]uch claims have universally been found to be unpatentable under *Alice*." Dkt. No. 66 at 4. By the time My Health filed its 2016 lawsuits, guidance from the Federal Circuit regarding claims in this category had mounted to a level that would give any litigant a reasonably clear view of § 101's boundaries. The numerous cases invalidating claims directed to information collection and analysis, such as the '985 patent claims, stood in stark contrast to the handful of cases reaching the contrary conclusion under *Alice*, such as *Enfish, LLC v. Microsoft Corporation*, 822 F.3d 1327 (Fed. Cir. 2016), which found a "specific improvement to the way computers operate" patent-eligible. There were of course gray areas, but by the time My Health's 2016 lawsuits were filed, it should have been clear that the '985 patent claims were "manifestly directed to an abstract idea." *See Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*, No. 2016-2442, 2017 WL 6062460, at *4 (Fed. Cir. Dec. 8, 2017). There was no credible argument that the '985 patent claims fell into one of the eligible exceptions defined in cases such as *Enfish*.

The weakness in My Health's § 101 position is by itself a sufficient basis for finding the cases exceptional. As the Federal Circuit explained in *Inventor Holdings*, such a finding is well within the Court's discretion. *See id.* Indeed, declaring a case exceptional based solely on a party's weak position regarding patent eligibility "is necessary to deter wasteful litigation in the future." *Id.* (quoting lower court opinion).

The Court's previous denial of the motion to dismiss in the *LifeScan* case did not give My Health a reasonable basis to continue asserting the '985 patent. As in *Inventor Holdings*, this Court never "endorsed the patent-eligibility of the asserted claims" because the denial of a motion to dismiss is not a merits decision, but rather only the postponement of the merits decision. *See id.* at *5. It was My Health's responsibility to "reassess its case in view of new controlling law," namely decision after decision from the Federal Circuit finding claims in the information-based category, such as those in the '985 patent, ineligible under *Alice*. *See id.* at *6.

My Health stresses the '985 patent's presumption of validity, but the presumption is not enough to avoid an exceptionality finding. *See* Dkt. No. 90 at 8-9. To My Health's credit, the presumption has been considered by courts denying fees on the basis of a weak validity position under § 101. *See, e.g.*, *Garfum.com Corp. v. Reflections by Ruth*, No. CV 14-5919-JBS-KMW), 2016 WL 7325467, at *4 (D.N.J. Dec. 16, 2016). In cases such as *Garfum.com*, however, the reluctance to find exceptionality, based in part on the presumption of validity, is not unreasonable when the examiner considered whether the patent was eligible under current § 101 law, as the court in *Garfum.com* emphasized. *See also Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1323 (Fed. Cir. 1999) (explaining relevance of the agency's initial consideration of the question being raised in litigation to the presumption of validity); *B/E Aerospace, Inc. v. Zodiac Aerospace*, No. 2:16-cv-01417-JRG, 2017 WL 1684540, at *9 (E.D. Tex. Apr. 17, 2017). But the '985 patent issued in 2003, well before *Alice*, and it would be a mistake to overemphasize the presumption. The examiner that allowed the '985 patent claims did not contemplate developments in the law that unfolded more than a decade later.

My Health's cases are exceptional for other reasons. The litigation campaign was extensive—31 lawsuits, 11 declaratory judgment actions, and 5 IPRs—all without a determination

on the merits until 2017, five years after My Health's campaign began. To be sure, a volume litigant does not automatically expose himself to attorneys' fees simply because he files a lot of lawsuits. But the number of lawsuits filed by My Health, many of which settled right on the cusp of a merits determination (most for similar amounts), supports the conclusion that My Health was filing lawsuits "for the sole purpose of forcing settlements, with no intention of testing the merits of [the] claims." *SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344, 1350 (Fed. Cir. 2015).

This conclusion is bolstered by the similar settlement amounts reached with different defendants. Most of the settlement agreements entered into after *Alice* were for remarkably similar amounts, most of them falling between $25,000 and $50,000. Three settlement agreements involving different defendants were all for exactly $30,000. Given the lack of a determination on the merits in the district court actions or the IPRs until five years into the litigation campaign, the similar settlement amounts strongly suggest that My Health was "exploiting the high cost to defend complex litigation to extract a nuisance value settlement." *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1327 (Fed. Cir. 2011). The settlement amounts against the different defendants could not have possibly been tied to a reasonable royalty for use of the claimed invention. There is nothing in the record suggesting that the amounts were tied to the alleged invention's footprint in the marketplace. It would be implausible to suggest that so many different defendants had made or sold roughly the same number of allegedly infringing units at the time of settlement.

Importantly, there is evidence in the record suggesting that the $25,000 to $50,000 settlement amounts do in fact represent a "nuisance" value, or in other words a value that is far less than the cost of defending a patent infringement lawsuit. Each defendant seeking fees in this case spent between $82,000 and $111,000 through the early discovery phase of the case, and the most significant event in the cases was the defendant's motion to dismiss. Most of My Health's

settlement amounts, at least those that arose after *Alice*, were for roughly half the amount each defendant spent on the case before a claim construction hearing could be held, or in other words, before any merits determination could be made. My Health's settlement offers effectively ensured that the '985 patent's susceptibility to invalidation under § 101 remained unexposed. *See id.* at 1327. This supports a finding of exceptionality. *See Rothschild Connected Devices Innovations, LLC v. Guardian Prot. Servs., Inc.*, 858 F.3d 1383, 1389-90 (Fed. Cir. 2017).

The cases are also exceptional in light of My Health's conduct in dealing with and litigating the cases against the defendants that are seeking fees. On at least two occasions, My Health's counsel directly contacted a defendant's CEO after having been made aware that the defendant was represented by counsel. *See* Dkt. Nos. 81-16 (My NetDiary) and 81-18 (ALRT). In the case of MyNetDiary, the direct contact came after My Health's counsel was given a stern warning not to contact MyNetDiary directly. Dkt. No. 81-15. The warning was ignored.

My Health's direct communication with the represented defendants was improper. At the time My Health sent the letters to the represented defendants, My Health's counsel was a member of Utah bar. Utah, like most if not all other states, forbids a lawyer to "communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer."[5] Improper letters sent directly to the defendant—who has hired a lawyer in part to be free and clear of any such contact—supports the conclusion that My Health's cases are exceptional.

Other aspects of My Health's litigation behavior are troubling. My Health filed a notice of appeal after the § 101 decision, followed by a motion to stay the determination on the fees motion. After the motion to stay the fees determination was denied, My Health filed a motion to dismiss

---

[5] Rule 4.2(a), available at https://www.utcourts.gov/resources/rules/ ucja/ch13/4_2.htm.

11

the appeal with the Federal Circuit. My Health's intention may not have been to evade a determination on defendants' fees motion, but the circumstances cast this conclusion in doubt. Notably, My Health was ultimately unwilling to test this Court's § 101 determination at the Federal Circuit, even though there would have been only a single appellate issue to brief and argue.

The motion to dismiss the appeal My Health filed with the Federal Circuit is also troubling. When an attorney signs a motion, he represents to the best of his knowledge that the contentions being presented to the Court are accurate. *See* Fed. R. Civ. P. 11(b). My Health's counsel represented to the Federal Circuit that the parties had met and conferred, agreed to dismiss the appeal, and agreed that each side would bear their own costs. Dkt. No. 106-1 at 1-2. That appears to have been untrue. *See* Dkt. No. 106. My Health has never offered a satisfactory explanation for the misrepresentation. Similar questionable avoidance tactics occurred here, with My Health's counsel representing that the hearing on the fees motions should be continued because of a conflict that was in fact no conflict at all. *See* Dkt. No. 106 at 1-2. In sum, the totality of the circumstances support the conclusion that My Health's cases are exceptional.

The only remaining matter is the amount of fees. Defendants request the following:

| | |
|---|---|
| ALRT | $82,198.95 |
| InTouch | $94,339.50 |
| MyNetDiary | $83,329.50 |
| McKesson | $111,995.00 |

My Health does not dispute that counsel for the defendants charged reasonable hourly rates, but My Health disputes the amount of the fees. My Health originally stated that without supporting affidavits, there was no way for My Health to determine whether these fee amounts were reasonable. In reply, the defendants submitted detailed time records justifying that the number of hours worked was reasonable. *See* Dkt. Nos. 97-1 through 97-4.

My Health's only opposition to the amount of the fees award is at page five of My Health's surreply brief. *See* Dkt. No. 119 at 5. My Health argues that the invoices submitted by the defendants are heavily redacted, making them difficult to assess. But the Court had no trouble reviewing the invoices—only privileged information was redacted. Importantly, the invoices show that the same time was not counted multiple times for each defendant but rather divided among the defendants. *See* Dkt. Nos. 97-1 through 97-4.

Other than the argument about redaction, the only other argument My Health makes is that at least $58,855.50 may have been billed for work on an IPR petition, which according to My Health "is unrelated to My Health's infringement claims." *See* Dkt. No. 119 at 5 n.1. That argument is not persuasive here; the defendants never would have sought IPR if they had not been sued for allegedly infringing the '985 patent. My Health should have known about the susceptibility of the '985 patent to invalidation under § 101 at the time the lawsuit was filed. Subsequent events, including defendants' pursuit of IPR, were necessarily caused by My Health's initiation of the lawsuits. Consequently, all of the defendants' reasonable expenses after the day My Health filed suit should be awarded. *See Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186-90 (2017) (explaining but-for causation requirement for determining attorneys' fees).

## CONCLUSION

For these reasons, it is ordered and adjudged as follows:

(1) My Health's cases are declared exceptional under 35 U.S.C. § 285.

(2) My Health is ordered to pay the following defendants' attorneys' fees, through defendants' counsel, within 60 days:

    a. ALR Technologies, Inc.:     $82,198.95

    b. InTouch Technologies, Inc.:     $94,339.50

    c.  MyNetDiary, Inc.:        $83,329.50

    d.  McKesson Technologies, Inc.:    $111,995.00

**SIGNED this 19th day of December, 2017.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE